IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARC E. OLIVER, d/b/a GULF COAST ENVIRONMENTAL AND RECOVERY, And T.M. JEMISON CONSTRUCTION CO. INC. d/b/a JEMISON MARINE, INC., | | |
| Plaintiffs, | : | CA 11-223-KD-C |
| MIDSOUTH BANK, N.A., | | IN ADMIRALTY |
| Plaintiff/Counter-Defendant | : | *In Personam and In Rem* |
| v. | : | |
| M/V BARBARY COAST, her engines, tackle, furniture, and appurtenances, etc., *In Rem*, and RODD CAIRNS, an individual, and ATCHAFALYA MARINE, LLC, *In personam*, | | |
| Defendants/Counter-Plaintiffs/ Third-Party Plaintiffs, | : | |
| v. | : | |
| EAGLE RIVER TOWING, L.L.C., p/k/a/or a/k/a EAGLE INLAND TOWING, and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, LOUISIANA LIMESTONE & LOGISTICS, L.L.C., and CURTIS BUFORD, | | |
| Third-Party Defendants. | : | |

**REPORT AND RECOMMENDATION**

Before the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B), is Substitute Custodian Southern Marine's ("Southern") "Motion to Disburse Custodial Fees" (Doc. 121), Intervenor-Plaintiff Midsouth Bank, N.A.'s objection thereto (Doc. 137), Southern's response to Judge DuBose's November 18, 2011 Order[1] (Doc. 159), and Midsouth's surreply (Doc. 164).

---

[1] On November 18, 2011, Judge DuBose found three of the five categories of

After Judge DuBose's November 18, 2011 Order, the only issues raised by Southern's motion remaining—and addressed in the requisite supplemental briefing—were the expenses associated with boom rental and storage/wharfage. An evidentiary hearing as to those issues was conducted by the undersigned on January 24, 2012. And based on the parties' briefing and the evidence presented to the Court, it is **RECOMMENDED** that Southern's motion (Doc. 121) be **GRANTED IN PART**, as set out herein, and that it be awarded **$7,800** for storage/wharfage and **nothing** for boom rental.

### Standard

1. Generally, for an expense to gain preferential treatment as an *custodia legis* expense, there must be preapproval by the Court.

"In order to qualify for preferential treatment as an expense *in custodia legis*, an expense must be incurred 'upon the authority of the court or its officer,' and be 'for the common benefit of those interested in [the] fund.'" *Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 176, 182 (3d Cir. 1993) (quoting *Kingstate Oil v. M/V GREEN STAR*, 815 F.2d 918, 922-24 (3d Cir. 1987) (quoting, in turn, *New York Dock Co. v. S.S. POZNAN*, 274 U.S. 117, 121 (1927))); *see Fortis Bank (Nederland) N.V. v. M/V*

---

expenses sought by Southern to be recoverable—installation of a high water bilge alarm ($340), removal of excessive water/oil mixture in the bilge ($1,055), and the cost to list the United States Marshal as an additional insured ($265). (Doc. 155 at 1-2.) The Court further found that Midsouth failed to establish its entitlement, as purchaser of the vessel, to an accounting for "unresolved claims," as set forth in its objection (Doc. 137 at 8-9) (*see* Doc. 155 at 2). Finally, the Court ordered Southern to supplement its motion as to the two remaining categories of expenses and explain "the basis for the requested boom and storage wharfage expenses, their 'necessary' nature, and how such expenses were 'reasonably incurred[.]'" (*Id.* at 3.)

*SHAMROCK*, 379 F. Supp. 2d 2, 7-8 (D. Me. 2005) (same); *see also Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 465 F.3d 1267, 1272 (11th Cir. 2006) ("Steamship is not entitled, under the doctrine of *custodia legis*, to equitable prioritization of its claim for the value of insurance it provided to the vessel after its arrest **because it did not first seek or receive the district court's permission to provide such insurance**[.]") (emphasis added).

2. Southern's ability, as the Court-appointed substitute custodian, to seek its custodial expenses, however, is not barred by its failure to seek preapproval for the expenses it incurred as the substitute custodian.

While the Eleventh Circuit has remarked that "those furnishing custodial services to a ship *in custodia legis* are gambling on a wholly unpredictable result unless they take the precaution of having their services authorized in advance of any order of the custodial court[,]" *Dresdner Bank*, 465 F.3d at 1273 (quoting *Bassis v. Universal Line, S. A.*, 484 F.2d 1065, 1068 (2d Cir. 1973)), Southern's appointment by this Court as the substitute custodian enables it to seek the recoupment of expenses it incurred while performing that role. *See General Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration*, 668 F.2d 811, 816 (5th Cir. 1982) ("[S]ervices or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court **or of an officer of the court** (here, the keeper[2]) **acting within his authority**, should be allowed as a *custodia legis* expense.") (citations omitted and footnote and emphasis added); *see also Turner v. Neptune Towing & Recovery, Inc.*, No. 8:09–CV–1071–T–27AEP,

---

[2] The appointment of a substitute custodian is an alternative to placing aboard a vessel a keeper under the Marshal's surveillance. *Donald D. Forsht Assocs., Inc. v. Transamerica ICS, Inc.*, 821 F.2d 1556, 1560 (11th Cir. 1987).

2011 WL 4542265, at *10 (M.D. Fla. Sep. 23, 2011) ("Neptune is [ ] entitled to recover the **reasonable** expenses it has incurred as substitute custodian.") (citing *Drill Ship Mission Exploration*) (emphasis added); *Absolute Marine Towing & Salvage, Inc. v. S/V INIKI*, No. 6:09–cv–1712–Orl–31KRS, 2011 WL 2183054, at *1 (M.D. Fla. May 18, 2011) (report of the Magistrate Judge recommending that the unopposed motion for taxation of substitute custodial fees against defendant vessel *in rem* be granted) (citing *Drill Ship Mission Exploration*).

3. Southern, as substitute custodian, however, still bears the burden of establishing that its expenses were incurred for the common benefit of all <u>interested parties.</u>

For the Court to give priority to the boom rental and storage/wharfage expenses—as "expense[s] of justice"—Southern must establish that those expenses were incurred "for the common benefit of [all] interested [parties.]" *The Poznan*, 274 U.S. at 121 (citation and internal quotation marks omitted); *see also Oil Shipping (Bunkering) B.V. v. Royal Bank of Scotland plc*, 817 F. Supp. 1254, 1260 n.8 (E.D. Pa. 1993) ("[T]he ability of the substitute custodian to incur administrative expenses is limited to legitimate expenses that benefit all the interested parties and are necessary for the due care and preservation of the vessel.") (citations omitted).

**Discussion**

1.  <u>Storage/wharfage.</u>

On April 7, 2011—before the vessel was arrested, on May 5, 2011 (*see* Doc. 12), and Southern was appointed substitute custodian, on May 13, 2011 (*see* Doc. 18[3])—Rodd Cairns, on behalf of Atchafalaya Marine, entered into a rental agreement with Southern to dock the vessel at its facility (*see* Doc. 159-1 at 12; Midsouth Hearing Ex. 3) at the rate of $750 per day (*see id.*; *see also* Doc. 159-1 at 1-3, Dec. 2, 2011 Mr. Connie Oliver Aff., ¶ 4 ("The original rate I quoted Rodd Cairns was for $750.00/day, which included the boom rental.")).

While Mr. Oliver, Southern's owner, testified that Southern does not have a usual rate for a vessel such as the M/V BARBARY COAST, the rate charged ($750) is far in excess of the daily rate Southern typically charges for a boat slip rental at its facility.[4]

---

[3]   Mr. Oliver's affidavit in support of the third motion to appoint substitute custodian (Doc. 16-6) provides:

> Southern Marine is a secure, fenced site that covers 5 ½ acres with a capacity of up to 100 vessels with up to 8' of draft.  The marina has a full dry dock and ship yard with heavy lift capability.  Southern Marine has adequate facilities and supervision for the proper safekeeping of said vessel, said facilities being located at 4514 Dauphin Island Parkway, Mobile Alabama 36605.  Southern Marine has insurance coverage for its liability as Substitute Custodian in the amount of $1,000,000/2,000,000.00 and has the U.S. Marshal Service listed as additional insured.  Southern Marine has previously been approved by the United States District Court, with the same policy of insurance, as Substitute Custodian of a seized vessel.

(*Id.*)

[4]   Mr. Oliver, in a separate affidavit (dated December 20, 2011) attached to Midsouth's opposition (Doc. 164 at 10-12; Midsouth Hearing Ex. 4), has provided, however, that Southern

Southern justifies this increased rate by explaining—basically—that as the substitute custodian it assumed responsibility for the safety of the vessel, whereas with a simple slip rental, Southern has no responsibility for the safety of a vessel. In connection with its assumption of responsibility for the vessel, Mr. Oliver testified that Southern took daily actions over and above what it would have done for a vessel that was merely moored at its facility. He testified that "[t]o ensure the safe mooring of the vessel, [he] sank two additional pilings for its moorings" on April 8, 2011. (Dec. 2, 2011 Oliver Aff., ¶ 5.) He further

> inspected the bilge and moorings at a minimum two times per day and kept a log of such.[5] [He] also oversaw other work performed on the vessel, such as the instillation of a high water alarm; instillation of a fire alarm system[. And he] added additional lines to the moorings that were the property of Southern; inventoried the vessel; worked with the Coast Guard regarding the vessel; initiated and oversaw the pumping of the bilge; deployed boom, recovered boom and cleaned boom around the vessel; developed an evacuation plan in case of a hurricane; kept unauthorized persons off the vessel; and spent more than one night at the

---

> generally has two rates for wharfage for pleasure craft. For pleasure craft 24' and under, the monthly rate is $150.00/month. For pleasure craft 25' and up, the rate is $250.00/month. These rates do not include inspection or maintenance by marina personnel and all adjustments of moorings or bilge inspections are solely the responsibility of the vessel owner.

(*Id.*, ¶ 2.)

Mr. Oliver further provided that "[w]hen an individual wants to rent a slip, he is required to sign a liability form" (*id.*, ¶ 3) and, on the commercial side of Southern's business, "[t]he rates for the shipyard are completely dependent on the size of the vessel, the work being done, the amount of available space in the yard and the time the vessel will be in yard" and "can range from $150.00/day to $2,500.00/day" (*id.*, ¶ 4).

[5] Mr. Oliver's log, which begins on April 7, 2011 and ends on September 22, 2011, is contained in Doc. 159-1, at pages 13-173. (*See also* Midsouth Hearing Ex. 11.)

marina during inclement weather to ensure the vessel was secure. Finally, [he] incurred attorney's fees for the various filings and hearings associated with being Substitute Custodian.

(*Id.*, ¶ 6 (footnote added).)

In the substitute custodian's motion for fees, the $750 per day rate was lowered to $250 per day for wharfage plus $250 per day for boom rental. (*See* Doc. 121 at 2 & 6 (Ex. C, Southern's invoice).) Midsouth's objection (Doc. 137) provides that "[t]here is no basis or foundation for the [ ] reduced charge" (*id.* at 6), and Southern's only explanation—made in response to Judge DuBose's November 18, 2011 Order (*see* Doc. 159 at 3) and again at the hearing on January 24, 2012—is "[t]hat the rate was reduced and broken out in light of the duration of the stay of the vessel at Southern" (*id.*).

At the hearing, Midsouth provided testimony regarding the reasonableness of the daily rate from Chris Collier (*see also* Doc. 164, Ex. C., at 15-16), a marine surveyor with 36 years experience, and Bob Schwartz (*see also* Doc. 137, Ex. C., at 14-15), the Controller for Dog River Marina. Through his affidavit, which sets forth testimony substantially similar to his testimony at the hearing, Mr. Collier states that he is

> familiar with what shipyards charge for serving as custodians for vessels, principally in recent years for those vessels up to 100' long awaiting foreclosure sales, usually by the U.S. Marshal in Mobile. In [his] opinion, a fair charge for such safekeeping and custodial service is $35.00 to $50.00 per day, which assumes that the vessel is in "wet dock" or overboard, and that no night watchman is employed, but care is taken of the vessel during working daylight hours, which would include tending lines and pumping out same as needed.

(Doc. 164 at 15-16.)   Mr. Schwartz testified that Dog River Marina—which appears to be where Midsouth docked the M/V BARBARY COAST for at least sometime during

7

January, 2012 (*see* Hearing Ex. Midsouth Schwartz #1 (stall rental receipt for $650))—charges $10 per foot (uncovered) and $12 per foot (covered) plus power **per month for wharfage** of vessels like the M/V BARBARY COAST (*see* Doc. 137 at 14).[6]

Because storage/wharfage of a vessel by the Court-appointed substitute custodian is generally "necessary for the due care and preservation of the vessel," *Oil Shipping (Bunkering) B.V.*, 817 F. Supp. at 1260 n.8, it is an expense incurred "for the common benefit of [all] interested [parties,]" *The Poznan*, 274 U.S. at 121.  The evidence presented in this matter, however, does not show that $250 per day is a legitimate rate for the services this substitute custodian provided in this regard.  *See Oil Shipping (Bunkering) B.V.*, 817 F. Supp. at 1260 n.8 ("[T]he ability of the substitute custodian to incur administrative expenses is **limited to legitimate expenses**[.]") (emphasis added). Based on the evidence presented, the undersigned finds a rate of $60 per day to be legitimate, and thus the substitute custodian should be awarded $7,800 for the 130 days the M/V BARBARY COAST was stored/wharfed at Southern.  The $60 daily rate takes into consideration, primarily, the testimony of Mr. Collier and the fact that while Southern did not have to incur the expense of hiring a night watchman, according to his testimony, Mr. Oliver spent more than one night at the marina during inclement weather to ensure the vessel was secure.

---

[6] Dog River Marina's "facilities include a night watchman and a well lighted area, as well as pumping of vessels when needed."  (*Id.* at 15.)

2.  <u>Boom rental.</u>

Southern originally requested $32,500 for "rental [of 200 feet of] boom required by the U.S. Coast Guard[.]" (Doc. 121 at 2 & 6.) This amount was based on a rate of $1.25 per foot per day for 130 days. (*Id.*)[7] During the hearing, Southern conceded that the boom was not deployed for the entire 130 days the M/V BARBARY COAST was at Southern, but for only a 65-day period (from July 11, 2011 to September 14, 2011). (*See also* Doc. 159-1 at 112 (notation in Mr. Oliver's log that boom was deployed on July 11, 2011).)

In addition to the fact that deployment of the boom was never "required by the [ ] Coast Guard,"[8] Southern has failed to show that the deployment of the boom was otherwise necessary, much less a **separate** "expense of justice" incurred "for the common benefit of [all] interested [parties.]" *The Poznan*, 274 U.S. at 121. Mr. Oliver testified that oil sheen was observed in the vicinity of the vessel when the boom was

---

[7] As provided above, the rental of the boom was included in the $750 per day rate Southern quoted originally. But, according to Southern, the $750 per day rate "was reduced and broken out"—$32,500 for storage/wharfage and $32,500 for boom rental—"in light of the duration of the stay of the vessel at Southern."

[8] By order of the Captain of the Port ("COTP") of Mobile (#125-11), dated August 19, 2011, the Coast Guard—based on its August 16, 2011 Inspection of the vessel, which revealed "excessive oil/water mixture in the bilge and [that] the vessel not fitted with a fire-detection system[,]" as required by federal regulations—ordered documentation of the removal of the excessive oil/water mixture, installation of a fire-detection system, and a Coast Guard safety inspection before the vessel could continue commercial operations. (*See* Doc. 100 at 5-6.) On September 15, 2011, after the vessel "satisfied requirements of COTP 125-11[,]" the order was rescinded. (*See* Doc. 137 at 12-13.)

Neither the original order or the communication rescinding that order mentioned oil leaking from the vessel or, moreover, required Southern deploy a boom to contain leaking oil.

deployed, but there is no documentation of—or witnesses other than Mr. Oliver who observed—this. It was never established, moreover, that the oil sheen Mr. Oliver observed was caused by a leak in the vessel. In fact, the testimony of Mr. Collier revealed that an alternative source of the alleged oil sheen could have been derelict hauls just north of Southern.

Further, because (1) the cost of boom rental (if required) was not a separate expense in the original quoted daily rate; (2) the substitute custodian's original motion erroneously **doubled** the number of days the boom was deployed (according to Mr. Oliver's log); and (3) the testimony of Mr. Schwartz that Dog River Marina deploys containment/absorption boom as part of its monthly rate charged to vessels stored at its facility and only charges additional for the cost of materials—such as absorption boom—consumed, the undersigned is not prepared to accept that the separate charge for boom rental is a "legitimate" administrative expense. *See Oil Shipping (Bunkering) B.V.*, 817 F. Supp. at 1260 n.8

## Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Southern Marine's motion be **GRANTED IN PART**, as set out herein, and that, as the Court-appointed substitute custodian, it be awarded **$7,800** for storage/wharfage and **nothing** for boom rental. The undersigned further **RECOMMENDS** that, consistent with Judge DuBose's November 18, 2011 Order (Doc. 155), Southern be awarded **$1,055** for removal of excessive water/oil mixture in the bilge; **$340** for installation of a high

water bilge alarm, and **$265** for the cost to list the United States Marshal as an additional insured.  (*See id.* at 2.)

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 27th day of February, 2012.

s/WILLIAM E. CASSADY<br>**UNITED STATES MAGISTRATE JUDGE**

# MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND <u>FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

l.   *Objection*.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in S.D. Ala. L.R. 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days[9] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[9]   Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"  FED. R. CIV. P. 72(b)(2).