**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ATCHAFALAYA MARINE, LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 11-00223-KD-N** |
| | ) | |
| **NATIONAL UNION FIRE INSURANCE** | ) | |
| **COMPANY OF PITTSBURGH, PA.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter came before the Court on March 14, 2013 for a <u>Hammond-Green Oil</u> hearing regarding the singular issue of damages relating to Defendant's Rule 50 Renewed Motion for Judgment as a Matter of Law (Doc. 377), Rule 59 Motion for New Trial (Doc. 378), and Motion for Remittitur (Doc. 379); Plaintiff's Response (Doc. 384); Defendant's Reply (Doc. 390); and Plaintiff's Supplement (Doc. 393).

## I.   <u>Background and Facts</u>[1]

In this case, Plaintiff Atchafalaya Marine, LLC ("Atchafalaya") asserted claims for breach of contract (Count VI), abnormal bad faith (Count VII) and normal bad faith (Count VIII) against Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union").   (Doc. 60 (as amended per Doc. 206)).   These claims stem from damage sustained to a commercial tugboat (the M/V BARBARY COAST) during a January 2010 salvage operation on the Tombigbee River in Alabama and an insurance dispute, which resulted from the incident.

Specifically, through Midsouth Bank, on September 12, 2008, Atchafalaya purchased the tugboat the M/V BARBARY COAST, at a cost of $790,000. Atchafalaya obtained a Preferred

---

[1] The "court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party."   <u>Beckwith v. City of Daytona Beach Shores, Fla.</u>, 58 F.3d 1554, 1560 (11th Cir. 1995).

Ship Mortgage for the $640,000.   The remainder was paid by Rodd Cairns, a member of the Atchafalaya LLC.

The M/V BARBARY COAST was the only asset of Atchafalaya. With the M/V BARBARY COAST as its only source of revenue, Atchafalaya earned gross receipts of $87,660 for the remainder of 2008; $330,253 in 2009; and $25,188 in 2010.   Starting in February 2009, Atchafalaya entered into an oral charter agreement with an entity named Eagle Inland Towing ("Eagle"), through which Eagle used the M/V BARBARY COAST.

On March 18, 2009, National Union issued an insurance policy (#H2035) to Eagle for the period of March 18, 2009-March 18, 2010; this policy provided coverage to Eagle for the towboats MR. LESTER, MISS KATEYLN and CARL T.   The insurance policy was obtained through Point Clear Insurance ("Point Clear"), with National Union as the insurer.   Per Endorsement #17 (also effective as of March 18, 2009), Atchafalaya was listed as an additional assured on the policy.[2] On June 2, 2009, the M/V BARBARY COAST tugboat was also added to the Schedule of Vessels on Eagle's insurance policy per Endorsement #18 with "all other terms and conditions remain[ing] unchanged."   According to the endorsement, the M/V BARBARY COAST's "Hull Agreed Valuation" was $800,000, with $1,000,000 for "Protection & Indemnity." On September 2, 2009, the M/V BARBARY COAST was deleted from Eagle's insurance policy per Endorsement #19.   On December 21, 2009, the M/V BARBARY COAST was added back to Eagle's insurance policy per Endorsement #23.   According to the endorsement, the M/V BARBARY COAST's "Hull Agreed Valuation" was $650,000, with

---

2 Endorsement #17 extended coverage to the "…subsidiary, affiliated, or interrelated companies of the Assured be the owners and/or charterers and/or operator and/or in whatever capacity."   Endorsement #17 provides further that "[n]otwithstanding the proceeding provisions, no party shall be deemed an additional Assured or favored with a waiver of subrogation on any vessel insured hereunder which is not actually engaged or involved in the intended operations at the time of the loss, if any."

$1,000,000 for "Protection & Indemnity."

On or about January 7, 2010, the M/V BARBARY COAST ran aground near mile marker 81 on the Tombigbee River during the course of a "rescue operation" (to free a grounded barge from a sandbar so a flotilla could continue to travel).   As a result, the M/V BARBARY COAST received extensive and severe damage, which required it to be salvaged, taken out of service, and towed to shore.   Once Atchafalaya learned of the damage to the M/V BARBARY COAST, it sought information regarding its insurance coverage (as it did not have a copy of the policy).

On January 21, 2010, the M/V BARBARY COAST was deleted from Eagle's insurance policy per Endorsement #24, and Eagle's insurance policy was cancelled in its entirety per Endorsement #26 on March 18, 2010.   At the time of the January 2010 incident, the M/V BARBARY COAST was insured under Eagle's policy #H2035 with National Union. Thereafter, Atchafalaya made numerous attempts to not only file, but to resolve, the insurance claim with National Union for the damages to the M/V BARBARY COAST.   However, these attempts were fraught with obstacles, and in the end, Atchafalaya's efforts failed for over a year.

Specifically, on February 2, 2010, Atchafalaya, through Jerri Lowrimore ("Lowrimore" - one of its members), made its first attempt to file an insurance claim with Point Clear (who issued the policy).   In response, Point Clear flatly rejected Atchafalaya's effort to file an insurance claim, instructing that the holder of the policy, Eagle, must file such claim. Atchafalaya, through Lowrimore and Rodd Cairns ("Cairns"), placed additional follow-up phone calls to Point Clear, but met with the same resistance and instruction.   Atchafalaya then contacted Eagle directly several times, but Eagle's owner did not want to file an insurance claim for the damage to the M/V BARBARY COAST, even though he had already filed claims on two

3

(2) other boats that had been damaged in the same incident.[3]   Atchafalaya also called Midsouth Bank and requested assistance in filing an insurance claim.   Initially, Midsouth Bank did not assist Atchafalaya.   Later, in March 2010, Midsouth Bank, through Jay Angelle (its counsel) made an unsuccessful attempt to file an insurance claim with Point Clear.

Faced with no insurance to repair the extensive damage to the M/V BARBARY COAST, no ability to pay the mortgage on the tugboat since it was not in working order, and a huge salvage claim, on April 9, 2010, Atchafalaya borrowed another $100,239 from Midsouth Bank to repair the tugboat in order to get it back in service.[4]   Cairns collateralized his home in Morgan City, Louisiana so that Atchafalaya could borrow this money.   In addition, because the salvager had removed the propellers, until the salvager was paid for his services (which was an impossibility due to Atchafalaya's inability to file a claim), Atchafalaya had to acquire other propellers at further cost to its business.

Atchafalaya continued to seek business although its tug was out of commission. Atchafalaya entered into a charter agreement[5] with Chris Buford of Louisiana Limestone & Logistics, LLC, for the use of the tugboat, which would commence once the M/V BARBARY COAST was repaired.   However, the M/V BARBARY COAST was out of service from January 2010 until August 2010, and then again in the Fall of 2010 due to additional engine repairs.   All of the repairs were necessitated by the January 2010 incident and, without the insurance claim being paid, Atchafalaya struggled to arrange for the repairs.

---

3  In April 2010, National Union settled the insurance claims of the two (2) other vessels (the M/V LESTER and the CARL T) which were involved in the January 2010 incident and which were insured under the same policy.

4  The evidence at trial indicates that either Cairns or Lowrimore also had to make cash payments for in the range of $10-15,000 to secure the loan and that they did not receive that cash back.

5  The evidence at trial indicated that this contract was valued at over $200,000.

On May 6, 2010, National Union received an e-mail from the original marine surveyor of the January 2010 incident (Don Joiner) which stated that the M/V BARBARY COAST had been recovered in the same operation as the M/V MR. LESTER.

Atchafalaya doggedly continued its quest to have the damages to the M/V BARBARY COAST and the salvage claim covered by its insurance policy with National Union. Atchafalaya even hired an attorney to determine who the insurer was, and to contact the insurer on Atchafalaya's behalf.   On September 21, 2010 Atchafalaya's attorney sent a letter to National Union notifying National Union of Atchafalaya's insurance claim.   The letter was sent to the correct address for National Union.   However, the letter was apparently "rerouted internally" to the workmen's compensation division.   On October 11, 2010, Chartris (a worker's compensation claim administrator) sent a letter to Atchafalaya's attorney, requesting the insurance policy and claim number.

At this point, Cairns took matters into his own hands on behalf of Atchafalaya.   Cairns conducted an internet search and discovered the name of a National Union attorney in Florida -- David Famulari ("Famulari").   On December 9, 2010, Cairns contacted Famulari, who reported that he was already aware of Eagle's claims as to two (2) other vessels.   Famulari requested that Cairns gather certain information regarding the M/V BARBARY COAST insurance claim.   In response, on December 20, 2010, Cairns sent Famulari: 1) a marine survey conducted on the M/V BARBARY COAST; 2) a letter from Midsouth Bank regarding repairs to the tugboat; 3) a repair proposal from Jemison Marine; and 4) a summary of the repair work which had already been performed on the tugboat.   Cairns communicated to Famulari: "[w]e are financially

5

pressed as a result of this incident and Garrell [Chiasson] has left us hanging out to dry."[6]   On December 30, 2010 Cairns notified Famulari via e-mail that Marc Oliver ("Oliver") was Atchafalaya's agent and that he had worked directly with the U.S. Coast Guard to establish a "salvage plan."

Almost two (2) more months passed, and as of January 18, 2011, National Union had still made no offer to Atchafalaya, or even hired an adjuster for its insurance claim.   At this point, Cairns had engaged Oliver the salvager, to assist him in having the insurance claim paid. Cairns also traveled to Miami, Florida to meet with Famulari to attempt to initiate action on Atchafalaya's insurance claim.   These efforts were unsuccessful.

Between January 18, 2011 and February 10, 2011 it is unclear what -- if anything -- National Union did to investigate Atchafalaya's insurance claim.   On January 28, 2011, Cairns informed Famulari that Atchafalaya's vendors were threatening seizure of the M/V BARBARY COAST for non-payment for repairs, and of the likelihood of business and personal bankruptcy if the claim was not resolved.   On February 9, 2011, Cairns told Famulari via e-mail that he was "being pressed for payment from many angles. It will only be a matter of time before this vessel is locked up/shut down and everything will have to be addressed in federal court without the benefit of any working capital or bank payments getting made. Is there anything you can tell me about the progress of the claim and whether Point Clear has made any effort to begin addressing our growing claims….Can you give me any advice on my next course of action to get this resolved…."   On February 10, 2011, Famulari's response was to instruct Cairns to file the claim with Point Clear – *the very company that originally rejected Atchafalaya's February 2010*

---

6  Chiasson is referenced in court documents as the manager member of Eagle Inland Towing, LLC. (Eagle-the insured under the #H2035 policy).

*attempt to do just that*.   This, even though Cairns had already repeatedly told Famulari that he and others (including Cairns' attorney and Midsouth Bank) had tried to file a claim with Point Clear but that Point Clear had refused and taken no action.   At trial, National Union argued vehemently that Point Clear was not its agent such that it should not be held responsible for Point Clear's refusal to allow Atchafalaya to file a claim on February 2, 2010.   However, based on Famulari's February 2011 e-mail to Cairns, instructing him to file a claim with Point Clear, the jury could reasonably have decided otherwise.

On February 17, 2011, Oliver contacted Famulari via telephone.   Around this date, Oliver submitted his own salvage claim to National Union for $175,000.   On February 18, 2011, National Union retained a marine surveyor to review Atchafalaya's claim and evaluate the damage to the M/V BARBARY COAST; per National Union's service standards, however, "[s]urveyors should be assigned the day the first notice is received."   When it did so, however, Famulari joked in correspondence about "mud sucking mosquito slapping Cajun[s]."[7]   In February 2011, Famulari was also aware that Oliver was threatening to seize the M/V BARBARY COAST to recover his salvage lien. By February 18, Cairns had requested that Famulari handle Oliver's salvage lien separately (which was possible under the policy).   Also, on behalf of Atchafalaya, Cairns also tried to arrange a meeting with the marine surveyor and with Famulari.   Famulari declined, stating that he did not have time to meet with Cairns.

From mid-February 2011 forward, it appears that National Union became focused -- with tunnel vision -- on the excessiveness of Oliver's salvage claim.   In March 2011, National Union finally met with Oliver and Cairns (along with a representative of Midsouth Bank) to address

---

7 National Union contends that this "joke" was not referring to Cairns.   This appears to be correct, however, the jury could have considered such a "joke" to be evidence of a lack of seriousness in the consideration of Atchafalaya's claim.

Oliver's salvage claim and Atchafalaya's insurance claim, in an effort to resolve both claims. Oliver left the meeting "in a huff" over National Union's refusal of insurance coverage for his salvage claim.   Cairns and the Midsouth Bank representative remained to discuss Atchafalaya's damage claim with National Union, but to no avail.   At this meeting, National Union learned that Cairns had been forced to collateralize his home in Morgan City, Louisiana in order to obtain funds to pay for the repair work to the tugboat.

After March 15, 2011, National Union never made an offer to Cairns to settle Atchafalaya's insurance claim for repairs and salvage relating to the M/V BARBARY COAST incident.   In approximately April/May 2011, Cairns discontinued operation of the vessel and the M/V BARBARY COAST sat dormant.

On May 3, 2011, with National Union having paid neither Atchafalaya's damage claim in full or any of the salvage claim, Oliver and Jemison Marine initiated this federal action and subsequently seized the M/V BARBARY COAST.   (Doc. 1).

In June or July 2011, National Union's insurance adjuster, Keith Morley, concluded that Atchafalaya's claim should be paid as a covered loss.   On July 7, 2011, Famulari issued his report for National Union (that he would not have recommended denial).   Still, National Union made no payments to Atchafalaya.

On September 7, 2011, the M/V BARBARY COAST sold for $100,000 at a public action held by the United States Marshals Service (S.D. Ala.) to Midsouth Bank (the successful bidder). Ultimately, by January 2012, Atchafalaya's vendors were paid and Oliver accepted a settlement of his salvage claim. Moreover, Midsouth Bank had forgiven Cairns' debt in settlement of his claim against Midsouth Bank.   Included in this forgiveness was the mortgage debt of $580,000

on the M/V BARBARY COAST.   However, as a result of the debt forgiveness, Atchafalaya was liable for capital gains taxes in an amount currently unknown.

On December 13, 2012, after hearing this evidence, the jury returned a verdict for Atchafalaya and awarded compensatory damages in the amount of $250,000 for breach of contract and $100,000 for bad faith, and $350,000 for bad faith punitive damages. (Doc. 369). On January 15, 2013, National Union moved for a new trial and a renewed judgment notwithstanding the verdict – contending that the evidence at trial failed to support any award of damages on Atchafalaya's claims.   (Docs. 377, 378).   National Union also moved for remittitur, claiming that the punitive damages award was excessive. (Doc. 379).

On January 17, 2013, the Court denied *in part* National Union's Renewed Motion for Judgment as a Matter of Law (Doc. 377) and Motion for New Trial (Doc. 378), "for those reasons previously stated in detail on the record during the trial," with the ***exception*** of that portion of those motions relating to Christopher Wells and punitive damages.   (Doc. 382).   As to those issues, the Court found as follows:

> Concerning the testimony of Christopher Wells ("Wells"), the Defendant claims that the Court committed reversible error because it initially excluded his testimony at trial on December 12, 2012.[1]  However, as noted by Defendant, the next morning December 13, 2012, the Court reversed its ruling after conducting its own research on the issue and allowed for Wells' testimony.   The fact that Wells' schedule did not allow for him to return to Court does not constitute reversible error by the Court.   As such, that portion of the Defendants' motions relating to the testimony of Wells is **DENIED** for these reasons.
>
> Regarding punitive damages, Defendant moves – as an alternative to its motion for new trial on the grounds that the punitive damages award is excessive – for remittitur.   Defendant contends that the Court erred because the jury's $350,000 punitive damages award is excessive and not supported by the evidence, and requests that the Court hold a Hammond-Green Oil[2] hearing.   In light of the procedures set forth in American Employers Ins. Co. v. Southern Seeding Servs., Inc., 931 F.2d 1453, 1457-1458 (11th Cir. 1991) (citing Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986) and Green Oil Co. v. Hornsby, 539 So.2d 218, 223-224 (Ala.1989)), further briefing is appropriate on this issue.

> [1] When Wells was called to the witness stand, the issue of the admissibility of his testimony

9

regarding the seaworthiness of the M/V BARBARY COAST and its grounding arose (insofar as his testimony would address "after-acquired evidence" relating to the reasons for Defendant's constructive denial of Plaintiff's claim). Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989).

[2] Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989).

The Court then scheduled a hearing on the post-trial motions stating that "the hearing will focus on the sufficiency of the evidence to support damages (compensatory and punitive) as well as whether the punitive damages award was excessive."   (Doc. 391).   In so doing, the Court noted that it had previously failed to address the sufficiency of the evidence for the damage awards for breach of contract and bad faith, and thus expanded the remaining issues for the post-trial motions to include compensatory damages for those claims.   (Id.)   On March 14, 2013, with briefing complete, a Hammond-Green Oil hearing was held.   After consideration of the parties' contentions, including those raised at the hearing, the Court now finds as follows.

## II.   Motion for New Trial & Renewed Judgment as a Matter of Law

## A.   Standards of Review: Rule 50(b) and Rule 59

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under 50(a)." Chaney v. City of Orlando, 483 F.3d 1221, 1227 (11th Cir. 2007).   See also Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006); Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1251 (11th Cir. 2007).   A jury verdict "must be left intact if there is evidence from which the decision maker...reasonably could have resolved the matter the way it did."   Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1264 (11th Cir. 2008). "The issue is not whether the evidence was sufficient for [the losing party] to have won, but whether the evidence was sufficient for it to have lost." Id. at 1264-1265.   The "court must

evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party." Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1560 (11th Cir. 1995). See also Nurse "BE" v. Columbia Palms West Hosp. Ltd. Partnership, 490 F.3d 1302, 1308 (11th Cir. 2007). The court determines whether "the facts and inferences point so overwhelmingly in favor of the movant...that reasonable people could not arrive at a contrary verdict." Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1448 (11th Cir. 1991). "[I]t is not the function of the Court to make credibility or factual determinations…if there are conflicting inferences that can be drawn from that evidence, it is not the Court's role to pick the better one." Marlite, Inc. v. Eckenrod, 2011 WL 39130, *3 (S.D. Fla. Jan. 5, 2011). "If the jury verdict is supported by substantial evidence…enough evidence that reasonable minds could differ concerning material facts - the motion should be denied. A mere scintilla of evidence in the entire record…is insufficient to support a verdict." U.S. Anchor Mfg. v. Rule Indus., Inc., 7 F.3d 986, 993 (11th Cir. 1993).[8] The court must "affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the plaintiff]." Telecom Tech. Servs., Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir. 2004).[9]

A Rule 59 motion for a new trial may be granted in the discretion of the trial court where "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a

---

[8] The Eleventh Circuit has explained that the jury's verdict must stand unless: "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."…It is the jury's task -- not ours – "to weigh conflicting evidence and inferences, and determine the credibility of the witnesses."…If reasonable jurors could reach different results, we must "not second guess the jury or substitute our judgment for its judgment." Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 715 (11th Cir. 2002) (citations omitted).

[9] Indeed, while there may have been conflicting testimony and evidence at trial (according to National Union), if there was a legally sufficient evidentiary basis in the record to sustain the jury's verdict, this will preclude the entry of judgment as a matter of law regardless of whether the evidence could have supported a contrary result. Marlite, 2011 WL 39130 (citing Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1264-1265 (11th Cir. 2008)).

verdict....Because it is critical that a judge does not merely substitute his judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great-not merely the greater-weight of the evidence.'" Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001). See also Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940); Montgomery v. Noga, 168 F.3d 1282, 1295 (11th Cir. 1999).   It is not a forum to relitigate old matters or to present arguments or evidence that could have been presented at trial. Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 763 (11th Cir. 2005). As explained by the Eleventh Circuit in Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc., 571 F.3d 1143, 1145 (11th Cir. 2009):

> While it is within a district court's discretion to grant a new trial if it finds a jury's "verdict is against the great, not merely the greater weight of the evidence," our application of this more rigorous standard of review ensures the district court does not simply substitute its own credibility choices and inferences for the reasonable choices and inferences made by the jury. ...If the jury's verdict is supported by the evidence, then it is immaterial that we or the district judge would have arrived at the same verdict because it is not our place to substitute our judgment for that of the jury....

Per the prior ruling of this Court, the singular remaining Rule 50(b)/Rule 59 issue is that of damages. Notably: 1) the amount of the jury's compensatory damages award of **$250,000** for breach of contract and **$100,000** for abnormal bad faith; and 2) the fact of, as well as the amount of, the jury's punitive damages award of **$350,000** for abnormal bad faith.  Under either standard of review, National Union's motions (Docs. 377, 378) are due to be denied.

### 1.     Compensatory Damages: the Amount of the Awards for Breach of Contract & Abnormal Bad Faith

National Union contends that Atchafalaya failed to present substantial evidence of the amount of the compensatory damages awards resulting from its breach of contract and abnormal bad faith claims, because its damages were "speculative" or "non-existent."   (Doc. 377 at 19, 29

(citing Brough v. Imperial Sterling Ltd., 297 F.3d 1172, 1178 (11th Cir. 2002)).   In so doing,

National Union suggests that certainty or precision regarding the evidence at trial for an exact

amount of damages was necessary for the jury to find as it did.    National Union is mistaken.

"[P]roof of the amount of damage is less severe than the burden of proving the fact of

damage."    G.M. Brod & Co., Inc. v. U.S. Home Corp, 759 F.2d 1526, 1540 (11th Cir. 1985).

The Eleventh Circuit has explained:

> Very often the nature of the wrong makes ascertainment of the damages difficult; but the
> Supreme Court has emphasized that "in such [a] case, while the damages may not be
> determined by mere speculation or guess, it will be enough if the evidence show[s] the
> extent of the damages as a matter of just and reasonable inference, although the result be
> only approximate.".…"[T]he jury may make a just and reasonable estimate of the damage
> based on relevant data…." In such circumstances "juries are allowed to act on probable
> and inferential as well as [upon] direct and positive proof.".…The indirect type of proof
> may include estimates based on assumptions, at least so long as the assumptions rest on
> adequate bases....

Id. (citing Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 24 (5th Cir. 1974)[10]).   In

addition, the Alabama Supreme Court specified in Parsons v. Aaron, 849 So.2d 932, 949 (Ala.

2002) (internal citations omitted):[11]

> "[i]n computing damages for breach of contract, a jury need not achieve 'mathematical
> precision.' Indeed, 'the uncertainty which prevents a recovery is uncertainty as to the fact
> of the damage and not as to its amount.' Thus, a 'plaintiff will not be denied a substantial
> recovery if he has produced the best evidence available and it is sufficient to afford a
> reasonable basis for estimating his loss.'"

See also In re Sharpe, 425 B.R. 620, 658 (Bankr. N.D. Ala. 2010) (citing Birmingham Coal &

Coke Co., Inc. v. Johnson, 10 So.3d 993, 998 (Ala. 2008)).   Moreover, in deciding whether to

---

10  The Eleventh Circuit, in Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as
precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

11  As this is a diversity case, the damages determination is a substantive issue and thus is governed by state law
(Alabama). See, e.g., McDermott v. Middle East Carpet Co. Associated, 811 F.2d 1422, 1426 (11th Cir. 1987).

"upset the jury's action[,]" courts consider whether "the jury's findings relating to damages are 'beyond the pale of sane judgment.'" G.M. Brod & Co., 759 F.2d at 1540.[12]  See generally Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555 (1931); American Life Ins. Co. v. Shell, 90 So.2d 719 (Ala. 1956).   Further, "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927).

With these principles in mind, the Court finds that the trial evidence supports the jury's awards, based on, but not limited to, the following examples.   The M/V BARBARY COAST, purchased for $790,000 in September 2008 (including a preferred ship mortgage in the amount of $640,000), was Atchafalaya's *only* asset.   As such, Atchafalaya's financial health necessarily depended upon the operability of this tugboat.   In three months of its first year of business in 2008, Atchafalaya earned gross receipts totaling $87,660.   In 2009, Atchafalaya's gross receipts totaled $330,253.   In February 2009, Atchafalaya entered into a charter agreement with an Eagle, through which Eagle used the M/V BARBARY COAST.   As of June 2, 2009, the M/V BARBARY COAST was listed on National Union's insurance policy with Eagle, with a "Hull Agreed Valuation" of $800,000, and $1,000,000 for "Protection & Indemnity."   Thus, as of late 2009, Atchafalaya was a new company that was able to obtain business-- it had good credit and good prospects and owned a tugboat that *according to National Union was worth $800,000.*

In the first month of 2010, the M/V BARBARY COAST ran aground as part of a salvage

---

12 See also e.g., City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 396 (1991) (citing with approval In re Japanese Elec. Prod. Antitrust Lit., 631 F.2d 1069, 1079 (3rd Cir. 1980) -- "[t]he law presumes that a jury will find facts and reach a verdict by rational means. It does not contemplate scientific precision….").

operation and was severely and extensively damaged.   National Union failed to timely pay the claim.   In 2010, Atchafalaya earned gross receipts totaling only $25,188, and the M/V BARBARY COAST was rendered, for the most part, inoperable during the better part of 2010. Atchafalaya struggled to keep its business afloat, but by April/May 2011, discontinued operation of the M/V BARBARY COAST.   By September 2011, Atchafalaya was underwater, swimming in debt, unable to earn revenue, a bad credit risk, and the tugboat was sold at auction for a mere $100,000.   Vendors who made repairs on the tugboat were still demanding payment (approximately $170,000 worth), Atchafalaya had no clients, Atchafalaya had no money (Cairns had even collateralized his home in Morgan City, Louisiana), Atchafalaya had no operable tugboat, and Atchafalaya's financial health flatlined.

The Court is not in a position to attempt to figure out *how* the jury arrived at the compensatory damages awards for breach of contract and bad faith, but rather, whether the trial evidence supports the amounts and the "jury had *some* reasonable basis for the amount of its award."   Parsons, 849 So.2d at 949 (emphasis added).   First, considering that Atchafalaya is now defunct and that there was significant evidence to attribute its demise to the failure of National Union to timely pay the claim, awarding $250,000 for placing Atchafalaya back to the position it was in before the breach is not unreasonable. Atchafalaya has lost the money that was initially invested in the tugboat, the money it had to pay to get the second loan, the time its members invested in getting the business off the ground and trying to get the claim paid, the expenses incurred in trying to get the claim paid, and an operable tugboat.

15

Moreover, the $100,000 of potential lost income on the abnormal bad faith claim is not unreasonable considering the gross receipts from the first full year of operation and the evidence regarding the estimated value of the Louisiana Limestone charter agreement of over $200,000.

Based on the foregoing, this is not an instance of pure guesswork, speculation, or a circumstance "[w]here…the jury verdict cannot be justified upon any reasonable hypothesis presented by the evidence[,]" such that it should be set aside.  Parsons, 849 So.2d at 949 (emphasis added).  After evaluating all the evidence (not limited to just the foregoing examples), the Court finds that the jury's compensatory damage awards must be left intact. There is sufficient evidence in the record from which the jury reasonably could have determined that Atchafalaya was damaged as a result of National Union's breach and that Atchafalaya produced the best evidence available at trial which was sufficient to afford a reasonable basis for the jury to *estimate* its loss for the breach of contract as well as for bad faith.  Parsons, 849 So.2d at 949-950.  There is no requirement for "exactness" or "mathematical precision," and National Union has not established that the awards are "beyond the pale of sane judgment."  In sum, the jury's compensatory damage awards are supported by legally sufficient evidentiary bases under Rule 50(b) and are not against the great weight of the evidence under Rule 59.

**2.      Punitive Damages: the Fact of the Award for Abnormal Bad Faith**

National Union asserts that Atchafalaya failed to satisfy its burden of establishing by clear and convincing evidence that National Union "consciously or deliberately" engaged in oppression or wantonness or malice with regard to Atchafalaya.  National Union correctly focuses on wantonness, contending that Atchafalaya failed to present substantial evidence that it

consciously and deliberately engaged in wanton conduct (Ala. Code § 6-11-20),[13] or that it took too long to pay the claim intentionally or with reckless indifference to the consequences.   In support, National Union asserts that it "investigated…[the] claim, attempted to resolve it, and, in fact, paid it[]" and references this being "a complicated claim with many facts and legal issues" with "an extensive cast of characters."   (Doc. 377 at 31).

However, the evidence at trial provides sufficient evidence from which the jury could have reasonably rendered a bad faith punitive damages award in Atchafalaya's favor.   This evidence includes, but is not limited to, the following examples of National Union's bad acts or inaction as to its insured and Atchafalaya's lengthy (but rejected) attempts to initiate a claim -- from which the jury could have reasonably found clear and convincing evidence that National Union consciously or deliberately engaged in oppression or wantonness or malice with regard to Atchafalaya.   For instance, Point Clear flatly rejected Atchafalaya's attempt to initiate a claim in February 2010, yet over a year later, National Union specifically instructed Atchafalaya to file the claim with Point Clear – even though it contends that Point Clear is unrelated to it, not its agent, etc.   Atchafalaya never received a copy of the insurance policy from National Union despite repeated requests.   National Union did not meet with Cairns when requested.   National Union admittedly misplaced and mishandled a September 21, 2010 letter from Cairns' attorney David Thorguson regarding the claim – "rerouting" the letter to an entirely different division in the company.   Famulari did not pursue an investigation of the insurance claim except upon Cairns insistence – even though Famulari was already aware of the salvage claims stemming *from the very same incident*.

---

13  According to Alabama Code § 6–11–20, "[p]unitive damages may not be awarded in any civil action .... other than a tort action where it is proven by clear and convincing evidence that the defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala.Code § 6–11–20(a).

Additionally, National Union's service standards provide that upon notice, it will open a claim within three (3) business days <u>and</u> appoint a marine surveyor within one (1) day; National Union did not comply with either of these standards as to Atchafalaya.   The difference in how National Union treated Atchafalaya versus other insureds was highlighted at trial when the jury heard evidence regarding two (2) other vessels *which were damaged in the very same incident and which were insured under the very same policy* and for which National Union not only opened, but concluded, an insurance claim *within 90 days*.   In this case, the incident occurred in January 2010 but National Union did not even retain a marine surveyor for Atchafalaya until February 18, 2011.   Also at that time, Famulari (National Union's attorney) sent out a letter with a joke about "mud sucking Cajuns", which the jury could have interpreted as National Union further showing a reckless disregard for Atchafalaya's rights under the policy.

Moreover, the evidence indicated that National Union knew of Atchafalaya's poor financial health after the tugboat was damaged, and the fact that the incident resulted in hefty salvage bills and an immediate need to pay its vendors and get back in business.   The jury perhaps concluded that National Union was thus well aware of Atchafalaya's real and pressing need to receive its insurance money for the tugboat, which National Union determined to be a covered loss under the policy. The jury could have reasonably found that this failure to timely pay the claim resulted, in part, in the M/V BARBARY COAST being sold at public auction a few months later in September 2011 for a mere $100,000 (when compared to National Union's own historically assigned values to the tugboat at $650-800,000). Based on these examples (which are not meant to be exclusive), the jury could have found that the evidence established an unreasonable delay by National Union, that it consciously and deliberately engaged in wanton

conduct as to Atchafalaya, and that it acted with reckless disregard to Atchafalaya's insured rights.

As noted *supra*, the gist of National Union's motion is that this was a "complex investigation," with a "extensive cast of characters," suggesting this as the explanation for the incredibly lengthy claims process and/or failure to open a claim, rather than any bad faith on its part.   The jury reasonably reached a different conclusion from the evidence at trial.   Cairns' constant efforts to communicate with National Union and have the insurance claim even started, much less resolved, are clear.   National Union's inaction or bad action, in response, were supported by sufficient evidence at trial.   It was the jury's job to assess the evidence and the credibility of those who testified, and from that, to determine whether National Union engaged in wanton conduct with reckless disregard to Atchafalaya's rights.   They concluded that National Union did.   That decision was within the province of the jury.   Moreover, the jury was correctly instructed on the applicable law and heard sufficient evidence on which to base the award of punitive damages under Alabama law.   Further, the jury answered a specific interrogatory in which they found by clear and convincing evidence that National Union consciously or deliberately acted toward Atchafalaya with oppression, fraud, malice or wantonness.   (Doc. 369-1 at 2).   In sum, the jury's punitive damages award for bad faith is supported by a legally sufficient evidentiary basis under Rule 50(b) and is not against the great weight of the evidence under Rule 59.

III.   <u>**Motion for Remittitur for Punitive Damages: the Amount of the Award**</u>[14]

As an alternative to a new trial, National Union moves for remittitur as to the $350,000 punitive damages award for Atchafalaya's bad faith claim, asserting that it "shocks the conscience under the circumstances of this case."[15]

As set forth by the U.S. Supreme Court in <u>Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc</u>., 492 U.S. 257 (1989), in reviewing an award of punitive damages, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.   <u>See also</u> <u>American Employers Ins. Co. v. Southern Seeding Servs., Inc</u>., 931 F. 2d 1453, 1458 (11th Cir. 1991).   Where the jury has properly determined liability but the award "exceeds the amount established by the evidence," the appropriate remedy is "a remittitur order reducing a jury's award to the outer limit of the proof," <u>Goldstein v. Manhattan Indus., Inc.</u>, 758 F.2d 1435, 1448 (11th Cir. 1995), or alternatively, to conduct "a new trial exclusively as to damages." <u>Aronowitz v. Health–Chem Corp</u>., 513 F.3d 1229, 1242 (11th Cir. 2008).   Although "a new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court," <u>Goldstein</u>, 758 F.2d at 1447, "the standard for remittitur is ... that it 'is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.'" <u>Moses v. K–Mart Corp</u>., 905 F. Supp. 1054, 1057 (S.D.

---

14  While given the opportunity to do so at the March 14, 2013 hearing, the parties declined to submit additional evidence regarding remittitur.

15  As set forth on the record at the March 14, 2013 hearing, the parties agree that this is not a constitutional reduction motion where the law does not permit the award (*i.e.*, a circumstance where there is an unconstitutionally excessive punitive damages verdict which must be constitutionally reduced to conform to the requirements of the due process clause). <u>See</u>, *e.g.*, <u>Johansen v. Combustion Eng., Inc.</u>, 170 F.3d 1320, 1331 (11th Cir. 1999). Punitive-damages awards are subject to a *de novo* standard of review, in accordance with <u>Cooper Indus., Inc. v. Leatherman Tool Group, Inc</u>., 532 U.S. 424 (2001). <u>Acceptance Ins. Co. v. Brown</u>, 832 So.2d 1 (Ala. 2001).

Fla. 1995) (quoting <u>Goldstein</u>, 758 F.2d at 1448). "[T]he Court is bound to allow Plaintiffs the maximum possible recovery," keeping in mind that "the Court is not to substitute its judgment for the jury's, and where there is sufficient evidence in the record to support the award, the Court should not reduce merely because it would have found differently." <u>Marlite</u>, 2011 WL 39130 at *4 (citing <u>Goldstein</u>, 758 F.2d at 1448).

When considering motions for remittitur of punitive damages in Alabama, courts apply the factors of <u>Green Oil Co. v . Hornsby</u>, 539 So.2d 218 (Ala. 1989) and <u>Hammond v. City of Gadsden</u>, 493 S.2d 1374 (Ala. 1986) within the framework of the guideposts of <u>Gore</u>, 517 U.S. 559, as restated in <u>State Farm</u>, 538 U.S. 408.[16]   See <u>e.g.</u>, <u>Ross v. Rosen-Rager</u>, 67 So.3d 29, 41 (Ala. 2010).[17]   In so doing, the Court must explain its rationale under the relevant factors and "reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on the grounds of excessiveness of the damages."   <u>Hammond</u>, 493 So.2d at 1379; <u>Williford v. Emerton</u>, 935 So.2d 1150, 1155-1156 (Ala. 2004).

Specifically, in <u>Gore</u>, 517 U.S. at 574-575, the Supreme Court set forth three (3) guideposts to ensure a punitive damages award is based on the application of law rather than a decisionmaker's caprice: 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. See, <u>e.g.</u>, <u>Myers v. Central Fla. Invest., Inc.</u>

---

16  Factors which are also set forth in Section 6-11-23 of the Alabama Code.

17  While a federal case, Alabama substantive law applies to this analysis. <u>Quality Foods, Inc. v. U.S. Fire Ins. Co.</u>, 715 F.2d 539, 542 n. 2 (11th Cir. 1983) (determination of whether jury verdict is excessive in a diversity case is left to the state substantive law); <u>Estate of Jackson v. Phillips Petroleum Co.</u>, 676 F. Supp. 1142, 1152 (S.D. Ala. 1987) (state substantive law determines whether the verdict was "excessive"). <u>American Employers</u>, 931 F.2d at 1457-1458. Although this case originated in admiralty, this became solely a diversity case per Doc. 298 at 2. As such, Alabama law governs.

592 F.3d 1201, 1218 (11th Cir. 2010); State Farm, 438 U.S. at 418. The Hammond-Green Oil factors – "which are similar[] and auxiliary in may respects[] to the Gore guideposts" -- are: 1) the reprehensibility of the defendant's conduct; 2) the relationship of the punitive damages award to the harm that actually occurred, or is likely to occur, from the defendant's conduct; 3) the defendant's profit from its misconduct; 4) the defendant's financial position; 5) the litigation cost to the plaintiff; 6) whether the defendant has been subject to criminal sanctions for similar conduct; and 7) other civil actions the defendant has been involved in arising out of similar conduct. Ross, 67 So.3d at 41.   In accordance with Alabama law, the Court addresses each factor below, to "reflect in the record the reasons for....refusing to [interfere with the jury's verdict]...on the grounds of excessiveness of the damages."   Hammond, 493 S.2d 1374.

### A.   Reprehensibility

The first Gore and Hammond-Green Oil guidepost is the degree of reprehensibility of National Union's conduct, and it is "the most important *indicium*" of the reasonableness of the punitive damages award. Gore, 517 at 575; State Farm, 538 U.S. 408, 419 (2003). See also Goldsmith, 513 F.3d at 1283; Action Marine, 481 F.3d at 1318.   To assess reprehensibility, courts consider whether: 1) the harm caused was physical as opposed to economic; 2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; 3) the target of the conduct was financially vulnerable; 4) the conduct involved repeated actions or was an isolated incident; and 5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. Goldsmith, 513 F.3d at 1283 (citing U.S. E.E.O.C. v. W&O, Inc., 213 F.3d 600, 614-615 (11th Cir. 2000)).

National Union's remittitur motion is primarily rooted in this first guidepost, as it asserts

that its conduct was not reprehensible because it investigated the claim, attempted in good faith to resolve the claim, paid the claim, and that the harm, if any, was only economic.   National Union adds that it did not show indifference to or a reckless disregard for Atchafalaya's rights, and there is no evidence that any harm suffered by Atchafalaya was the result of intentional malice, trickery or deceit, or of concealment or cover-up or that National Union previously engaged in the alleged conduct.   In contrast, Atchafalaya, relying on <u>National Ins. Ass'n v. Sockwell</u>, 829 So.2d 111, 136-140 (Ala. 2002) contends that "the most reprehensible conduct occurred after litigation was commenced by failing to pay and filing an answer denying coverage when the insurer had already determined that coverage existed[]" which are exactly the same circumstances of this case.   (Doc. 384 at 5).   According to Atchafalaya, for example, National Union's "protracted investigation in clear disregard for its own standards constituted a reckless disregard for its insured's rights….[and]…knew seizure [of the M/V BARBARY COAST] would result in financial ruination… flouted its own guidelines, breaching its own dictates not by days or weeks, but months and months…" (Doc. 384 at 12).

Given the facts and evidence before this Court, the degree of National Union's reprehensibility, as determined by the jury, is significant.   While National Union's harm to Atchafalaya was economic in nature, it appears that National Union wielded the death blow to a financial viable company.   As detailed *supra*, National Union's failure to timely pay Atchafalaya's claim significantly contributed to both the company and Cairns financial ruin. On behalf of Atchafalaya, Cairns was required to hire an attorney, collateralize his own home, and incur inordinate debt to try and save his business. Factors such as the duration of the conduct, National Union's awareness of the hazards created or likely to be created by its

23

conduct, any deliberate concealment of those hazards, and the frequency of the kind of conduct complained of, can be considered in determining the reprehensibility of a party's conduct. Tyson Foods, Inc. v. Stevens, 783 So.2d 804, 810 (Ala. 2000).   These factors are present in National Union's conduct.

Additionally, there can be no question that Atchafalaya was financially vulnerable. Gore, 517 U.S. at 576 (finding that such "might support a larger punitive-damages award[]"); Sockwell, 829 So.2d at 135-136.   Its *only* asset was the M/V BARBARY COAST. National Union agreed to provide protection for this sole asset and accepted the premiums.   Without this asset, Atchafalaya had no business, no income, and no future.   This fact was repeatedly emphasized to National Union, but National Union nevertheless failed to timely investigate and pay what was a covered loss under the policy.

Further, the harm to Atchafalaya was not the result of "mere accident" on the part of National Union.   However, neither was there evidence that the harm was the result of intentional malice, trickery or deceit.

### B.   **Disparity**

The second Gore and Hammond-Green Oil guidepost is the ratio of punitive damages to actual harm inflicted on the plaintiff: the "proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." Gore, 517 U.S. at 581 (emphasis in original).   "[C]omparison between the compensatory award and the punitive award is significant." Gore, 517 U.S. at 581 (citations omitted). While the ratio of punitive to compensatory damages is instructive, State Farm, 538 U.S. at 425, the Supreme Court has

"consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award[]" Gore, 517 U.S. at 582. See also Goldsmith, 513 F.3d at 1283.  "In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm, 538 U.S. at 426.

In this case, the jury awarded punitive damages of $350,000 and compensatory damages of $100,000, relating to the abnormal bad faith claim.   This yields a ratio of 3.5:1; this ratio does not suggest an excessive award as it is within "the single digits" and is not more than four times the amount of compensatory damages. See, e.g., Goldsmith, 513 F.3d at 1283 (noting that single digit multiplies are more likely to comport with due process); State Farm, 538 U.S. at 425 (noting that an award of more than four times the compensatory award "might be close to the line of constitutional impropriety[]").   The Court finds in light of the evidence that the ratio of punitive damages to compensatory damages comports with due process.   See, e.g., Parsons v. Whittemore Enter. Corp. v. Cello Energy, LLC, 2010 WL 3803189 (S.D. Ala. Sept. 22, 2010). But cf. Arnold v. Guideone Spec. Mut. Ins. Co., 142 F. Supp. 2d 1319, 1322 (N.D. Ala. 2001) (stating that "Alabama trial courts are now routinely ordering remittitur in cases in which punitive damages exceed a ratio of three to one over actual damages[]").

C.   **Penalties**

The third Gore guidepost and sixth and seventh Hammond-Green Oil factors direct the courts to assess penalties -- the disparity between the punitive damages awarded by the jury in this case and the civil and criminal penalties authorized or imposed in comparable cases.   Gore, 517 U.S. at 575.   This guidepost is "accorded less weight in the reasonableness analysis than

25

the first two guideposts." <u>Kenp v. Am. Tel. & Tel. Co.</u>, 393 F.3d 1354, 1364 (11th Cir. 2004). The parties state that there are no applicable civil penalties, and there is no evidence either that National Union was subject to civil or criminal sanctions for its conduct or that it had been involved in other civil actions arising out of similar conduct.

      **D.**      <u>**Hammond-Green Oil Factors 3 through 5**</u>

Regarding the third <u>Hammond-Green Oil</u> factor, National Union contends that the question of its profit from its misconduct requires remittitur because it "did not profit in this case….[it] paid the claim…there is no evidence [that it]…profited from any conduct[.]"   (Doc. 379 at 5).   However, National Union had use of the policy proceeds from March 2009 through the date Atchafalaya's claim was eventually paid; during that period, National Union benefitted financially from have possession of the policy proceeds through earnings, interest, or through some other form of financial benefit (even though the amount of profit or gain is unknown and probably not very much).   <u>Sockwell</u>, 829 So.3d at 139.

Concerning the fourth and fifth <u>Hammond-Green Oil</u> factor, the defendant's financial position and the litigation cost to the plaintiff, National Union had the opportunity to submit additional evidence to indicate how the punitive damages award would effect its financial position, but it did not submit any evidence much less credible evidence upon which the court could fully judge same.   A punitive damages award "should sting but not destroy" a defendant. <u>Orkin Exterminating Co. v. Jeter</u>, 832 So.2d 25, 42 (Ala. 2001).   Given the lack of evidence submitted by National Union as to its financial health, it does not appear that this award has significant financial consequences to National Union.   <u>See</u>, <u>e.g.</u>, <u>Tanner v. Ebbole</u>, 88 So.3d 856, 877-878 (Ala. Civ. App. 2011).

Additionally, the cost to Atchafalaya to litigate this case supports the damages awarded. Indeed, "we must consider whether the punitive-damages award was sufficient to reward the plaintiff's counsel for assuming the risk of bringing the lawsuit and to encourage other victims of wrongdoing to come forward and bring wrongdoers to trial. Orkin, 832 So.2d at 42 (citing Green Oil, 539 So.2d at 223).   Atchafalaya was represented by a solo practitioner. This case involved over 300 filed documents over 18 months, thousands of produced documents, required counsel travel to Georgia, Louisiana and Texas for depositions and interviews, and required counsel to bear the costs of experts and other expenses.   (Doc. 384 at 12-13).   The jury trial was also four (4) days in length, excluding jury selection.   (Id. at 13).   "Pursuing a bad-faith claim is a risky and expensive venture. It is possible that some of even the more determined plaintiffs may not be able to retain legal counsel because of the degree of risk involved. Considering the actual harm as well as the harm likely to result from National[] [Union's] misconduct, we find such misconduct to justify a significant punitive-damages award."   Sockwell, 829 So.3d at 138-139. As such, this is not a factor that diminishes the appropriateness of the punitive damages awarded to Atchafalaya, but rather supports same.   See, e.g., Tanner, 88 So.3d at 881.

In sum, after applying the relevant guideposts and factors to the facts of this case, the Court finds that the jury's $350,000 punitive damages award for abnormal bad faith withstands a federal constitutional inquiry under Gore and the excessiveness guidelines under Hammond-Green Oil.

## V.   Conclusion

Accordingly, after consideration of the arguments of counsel, the relevant law, and the record as a whole, the Court concludes that based on the foregoing as well as for those reasons

stated on the record, National Union's motions (Docs. 377, 378, 379) are **DENIED.**    As such, it is **ORDERED** that the jury's verdict, in favor of Atchafalaya, must stand.

    A Final Judgment consistent with the terms of this Order shall be entered by separate document as required by Rule 58 of the <u>Federal Rules of Civil Procedure</u>.

    **DONE** and **ORDERED** this the **1st** day of **April 2013.**

                    /s/ Kristi K. DuBose
                    **KRISTI K. DuBOSE**
                    **UNITED STATES DISTRICT JUDGE**